IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>GEARY SIMON (a/k/a "Robert Sutton")<br><br>Defendant. | CRIMINAL NO. 24-CR-284 (DLF)<br><br>Sentencing: May 6, 2025 |

### GOVERNMENT'S MEMORANDUM IN AID OF SENTENCING

The United States of America by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this memorandum in support of its sentencing recommendation in this case. Given the nature and seriousness of the defendant's offense and the defendant's history as a recidivist fraudster, the government requests that the Court sentence the defendant to a period of incarceration of 18 months. Such a sentence is both consistent with the Sentencing Guidelines and warranted in light of the sentencing factors outlined in 18 U.S.C. § 3553(a).

### BACKGROUND

**I.    The STAY DC Program**

It is no secret that during the COVID-19 pandemic millions of Americans faced housing insecurity. As of December 2020, an estimated 8.8 million tenants nationwide had fallen behind on their rent payments, which included more than one in four renters with incomes under $25,000.[1]

---

[1] Consumer Financial Protection Bureau, *Housing Insecurity and the COVID-19 Pandemic* at 6 (March 2021), https://files.consumerfinance.gov/f/documents/cfpb_Housing_insecurity_and_the_COVID-19_pandemic.pdf ("CFPB Report").

These levels of housing insecurity among renters prompted policymakers to respond with eviction moratoria. But even with the benefit of those postponements, millions of tenants still faced significant arrears and an inability to pay their landlords.[2] Unlike homeowners who could benefit from mortgage relief programs, there were no formal polices that allowed renters to defer their housing payments.[3]

In December 2020, Congress enacted an emergency rental assistance ("ERA") program administered by the U.S. Department of Treasury and funded that program with $25 billion intended for low-income tenants. (PSR[4] ¶ 16.) But at that time, according to researchers, renters nationwide owed $44 billion in unpaid back rent.[5] In a further response to the crisis, Congress provided an additional $21.55 billion in funds as part of the American Rescue Plan Act for a grand total of $46.55 billion in emergency rental assistance and housing stability services. (PSR ¶ 16.)

In April 2021, the District of Columbia allocated $352 million in Treasury-backed ERA program funds to the Stronger Together by Assisting You ("STAY DC") Program. (PSR ¶ 17.) The STAY DC program allowed renters in the District of Columbia who had lost income during the pandemic to receive financial support to cover rent and utility payments. (*Id.*) The U.S. Department of Treasury administered the STAY DC Program and, as such, the program provided benefits in connection with a presidentially declared major disaster or emergency. (*Id.*)

---

[2] *Id.* at 11

[3] *Id.* at 14.

[4] "PSR ¶ #" refers to the Presentence Investigation Report prepared by the probation office at the indicated paragraph number. "ECF #" refers to the ECF docket entries for this case at the indicated filing number. "Ex. #" refers to the exhibits to this memorandum.

[5] CFPB Report at 16.

## II.     The Scheme to Defraud the STAY DC Program

On June 22, 2021, Mr. Simon applied online to receive housing and utility assistance from the STAY DC Program. (PSR ¶ 19.) Simon used an online portal operated by the D.C. Department of Human Services and, consequently, submitted his application over the interstate wires. (*Id*.) Simon made the following statements in his application:

- Simon claimed that he was a "tenant" who rented a property at 2433 H Street, NW, Washington, D.C. (*Id*.);

- Simon stated that his landlord was "Robert Sutton" who had given Simon an eviction notice (*Id.* ¶ 20);

- Simon owed "Robert Sutton" the sum of $72,000 in past due rent for the months of April 2020 through June 2021 (*Id.*); and

- Simon stated that "Robert Sutton" used phone number (\*\*\*) \*\*\*-6693 and email address "rjs.ust9@gmail.com." (*Id.* ¶ 21.)

All of these statements were demonstrably false and fraudulent. (*Id.*) As Simon knew when he submitted his STAY DC application, the address that he gave—2433 H Street NW—was an address for a property that Simon and his ex-wife owned prior to a foreclosure sale on October 4, 2018. (*Id.* ¶ 20.) Simon never signed a lease for that property; he never received an eviction notice from "Robert Sutton"; and Simon never owed "Sutton" any arrears for unpaid rent—let alone $72,000 in arrears. (*Id.*) The telephone number that Simon provided for "Sutton" was for a telephone number that Simon used. (*Id.*) And the email address that Simon provided for "Sutton" was for an email account that Simon created and controlled. (*Id.*) In fact, as discussed further below, "Sutton" was not even a real person. (*Id.* ¶¶ 22-23.) And Simon was never a "tenant" and never needed rental assistance. (PSR ¶ 23.)

Nonetheless, on August 27, 2021, the STAY DC program issued a check to Simon in the amount of $38,560 based on Simon's materially false statements in his application. (*Id.* ¶ 24.) On

September 7, 2021, Simon deposited that check into Capital Bank account x1411, which is an account in the name of "The Geary Stephen Simon 2016 Irrevocable Trust." (*Id.* ¶ 25.)

### III. Simon's Use of the Criminal Proceeds

Once Simon had deposited the funds that he fraudulently obtained from the STAY DC program, he further misappropriated those funds by using them to pay private school tuition for his children and to satisfy his court-ordered child support obligations—not for rent or utilities as required by the STAY DC program. (*Id.*)

On September 1, 2021, just a few days before the deposit of the STAY DC check, Capital Bank Account x1411 had a balance of $112.37. Between September 1, 2021, and November 30, 2021, the total of all deposits into Account x1411 was $38,962.26—meaning that the STAY DC check in the amount of $38,560 comprised almost all of the funds deposited into Account x1411 over that period. (Ex. 1 at 1.)

Between September 1, 2021, and November 30, 2021, a total of $38,175.28 in funds were disbursed from Account x1411 as follows:

| DATE | PAYEE DESCRIPTION | AMMOUNT |
|---|---|---|
| September 10, 2021 | TADS TUITION AID TADS PMNT 2289977 | $7,856.32 |
| September 14, 2021 | TADS TUITION AID TADS PMNT 2289977 | $1,500.00 |
| September 15, 2021 | DCCSC CHILDSUPP | $1,034.00 |
| September 21, 2021 | TADS TUITION AID TADS PMNT 2289977 | $3,739.32 |

| DATE | PAYEE DESCRIPTION | AMMOUNT |
|---|---|---|
| September 21, 2021 | TADS TUITION AID TADS PMNT 2289977 | $4,197.00 |
| October 4, 2021 | DCCSC CHILDSUPP | $2,068.00 |
| October 6, 2021 | DCCSC CHILDSUPP | $1,034.00 |
| October 21, 2021 | TADS TUITION AID TADS PMNT 2289977 | $7,856.32 |
| November 22, 2021 | DCCSC CHILDSUPP | $1,034.00 |
| November 23, 2021 | TADS TUITION AID TADS PMNT 2289977 | $7,856.32 |
| | TOTAL | $38,175.28 |

(Ex. 1.) The payee description "TADS TUITION AID TADS PMNT 2289977" refers to payments made for private school tuition through the Tuition Aid Data Services—a payment platform used by private schools.[6] The payee description "DCCSC CHILD SUPP" refers to transfers Simon made to the District of Columbia Child Services Division. As noted in the chart above, Simon made a grand total of $38,175.28 to those two payees. Consequently, Simon used virtually all of the taxpayer-supported STAY DC funds for purposes other than rent and utilities.

---

[6] *See TADS*.com, https://www.tads.com/about (last visited April 28, 2025).

IV. **"Robert Sutton"**

In entering his guilty plea, Mr. Simon has admitted that he controlled an email account and phone number for the false persona "Robert Sutton." (ECF 11 ¶¶ 2, 7.) Simon has also admitted that he lied when he told the STAY DC program that "Robert Sutton" was his landlord. (PSR ¶¶ 20-23.) However, Simon used the false persona of "Robert Sutton" for fraudulent purposes for years before the crimes described in the case at bar.

For example, Simon has used his "Sutton" alias to interfere with foreclosure proceedings in two separate lawsuits filed in D.C. Superior Court. In the first lawsuit, *Fifth Third Bank v. Geary Simon Revocable Trust, et al.*, Case No. 2017 CA 006705 (the "Fifth Third Bank Case"), Fifth Third Bank sought to foreclose on a property that Simon owned and occupied at 1272 New Hampshire Avenue, NW. To stop the foreclosure on Simon's property, a company called "US Trust/Nine Lenders Capital Associates" ("UST9") filed a motion to intervene and claimed that it had a priority lien based on a secured promissory note that predated Fifth Third Bank's interest. The verification page of the motion to intervene was for execution by "Robert Sutton."

---

**VERIFICATION**

This is to verify that the undersigned is a principal, partner and/or officer of US Trust/Nine Lenders Capital Associates, f/k/a NineL Capital Associates, being the Intervenor herein and I verify that contents of the above and within Memorandum of Points and Authorities and Exhibits are true, accurate and correct to the best of my knowledge, information and belief. I am authorized to execute this Verification on behalf the Intervenor herein and I am competent to make this Verification.

Dated: July 26, 2018

US Trust/Nine Lenders Capital Associates,
f/k/a NineL Capital Associates

By:_____
Robert Sutton, Principal, Partner and/or Officer
Executed individually and on behalf of Intervenor

---

UST9 also attached a copy of the "note" and an alonge to the payment terms as exhibits to its motion to intervene to stop the foreclosure on Simon's property. Both of those documents were signed by "Robert Sutton" on behalf of UST9:



In the second lawsuit, *Roundpoint Mortgage Servicing Corp. v. Geary Simon, et al.*, Case No. 2018 CA 001734, Roundpoint sought foreclosure relief against Simon for an $85,000 promissory note also secured by Simon's property at 1272 New Hampshire Ave., NW. But while the Roundpoint case was pending, on August 14, 2018, UST9 filed a lawsuit in D.C. Superior Court, *US Trust Nine (f/k/a "Nine Lenders Capital Assoc.") v. Geary Simon*, et al., No. 2018 CA005831 in which UST9 sought to foreclose on the 1272 New Hampshire Avenue property claiming that Simon owed UST9 more than $841,663 under the note. UST9 also sought declaratory relief that UST9's claim against the property was "superior to the lien priority" of Fifth Third Bank and Roundpoint. UST9's complaint was verified "under the penalties [*sic*] of perjury" by "Robert J. Sutton" who was the "General Partner" of UST9:

7

> **VERIFICATION**
>
> I solemnly affirm under the penalties of perjury that all factual information set forth in the foregoing Complaint are true to the best of my knowledge, information, and belief, and that as General Partner of US Trust/Nine Lenders Capital Associates, I am duly authorized to so affirm on behalf of Plaintiff.
>
> US Trust/Nine Lenders Capital Associates
>
> By: [signature]
> Robert J. Sutton, General Partner
>
> Dated: August __, 2018

Another one of the attachments to UST9's complaint purported to be a Deed of Appointment executed before a notary by "Sutton." (Ex. 2.) But in a sworn affidavit, the notary public whose name appears on that document has disavowed that "Sutton" ever appeared before her to sign the document. (Ex. 3.)

Fifth Third Bank prevailed on summary judgment and the parties reached a settlement.[7] Roundpoint also moved to dismiss their case.[8] The sham lawsuit that "Sutton" filed on behalf of UST9 was dismissed by the court.[9] But Simon's use of the fake "Robert Sutton" persona and UST9 interfered with those legal proceedings and delayed the resolution of those cases.

---

[7] *See* 9/9/21 Motion for Voluntary Dismissal, *Fifth Third Bank v. Simon*, No. 2017 CA 006705 (D.C. Super. Ct.).

[8] *See* 2/11/21 Motion to Voluntarily Dismiss Case, *Roundpoint Mortgage v. Simon*, No. 2018 CA 001734 (D.C. Super. Ct.)

[9] The docket sheet for the UST9 case indicates that the case was "dismissed by Court" on October 15, 2021. Although there is not a final written order of dismissal, it appears that the case was dismissed after UST9 failed to respond to the court's notice of a status hearing. *See* 6/8/21, Notice of Returned Mail, *UST9 v. Simon*, No. 2018 CA 005831 ("Reason: Not Deliverable as addressed").

V.     **Possession of Two Firearms by a Felon**

As noted in the presentence report, Simon has at least two prior felony convictions from 1992 and 2016.  (PSR ¶ 30.)  Most recently, he was convicted of Carrying a Pistol Without a License, a felony, in D.C. Superior Court.  *United States v. Geary Simon*, No. 2016 CF2 015307. Simon knew that as a result of those two felony convictions Simon's possession of a firearm was a violation of federal law.  (PSR ¶ 39.)

On March 14, 2024, law enforcement executed a search warrant at Simon's residence.  (*Id.* ¶ 29.)  During the course of that search, law enforcement recovered two firearms: (1) a Ruger Mark II .22 caliber pistol and one magazine for that pistol containing four rounds; and (2) a .32 caliber revolver model R73 and five .32 caliber rounds of ammunition.  (*Id.*)  The firearms were stored in an unlocked closet that only the defendant and his two minor children used.  (*Id.*)  The two minor children could have accessed the firearms because they were not stored in a locked box or secure container, as required by District of Columbia law.  (*Id.*)

## SENTENCING GUIDELINES

As the Court is well aware, although the U.S. Sentencing Guidelines are advisory, sentencing courts "must consult those Guidelines and take them into account when sentencing." *United States v. Booker*, 543 U.S. 220, 261 (2005).  Thus, at sentencing a court must first calculate the Guidelines range applicable to the defendant.  *Nelson v. United States*, 555 U.S. 350, 351 (2009); *see also Gall v. United States*, 552 U.S. 38, 49-50 (2007).   The defendant has pleaded guilty to one count of wire fraud and one count of possession of a firearm by a prohibited person. The government and the defendant have agreed upon the following guideline range:

COUNT ONE: Wire Fraud (18 U.S.C. §1343)

| U.S.S.G. | Description | Levels |
|---|---|---|
| § 2B1.1(a)(1) | Base offense level | 7 |
| § 2B1.1(b)(1)(C) | Loss amount: ≤ $38,560 | + 0-4 |
| § 2B1.1(b)(10)(C) | Offense involved sophisticated means and the defendant intentionally engaged in or caused the conduct constituting sophisticated means | +2 |
| § 2B1.1(b)(11) | Offense involved the possession or use of an authentication feature | + 0-2 |
| | TOTAL | 9-15 |

COUNT TWO: Possession of a Firearm by a Prohibited Person (18 U.S.C. § 922(g)(1))

| U.S.S.G. | Description | Levels |
|---|---|---|
| § 2K2.1(a)(6)(A) | Base offense level | 14 |
| | TOTAL | 14 |

(PSR ¶ 6.)

  The parties agreed that Count One and Count Two are not closely related because they do not involve substantially the same harm. (*Id.* ¶ 7.) Consequently, each count should be treated as a separate group for sentencing. (*Id.*) The offense level for Group One (Count One) is between 9 and 15, and the offense level for Group Two (Count Two) is 14. (*Id.*) Pursuant to Guideline § 3D1.4, the combined offense level is between 15 and 17. (*Id.*) The government agreed to recommend either a two-level or three-level reduction for acceptance of responsibility for a total offense level of either 13 or 14.

  The government maintains that it is appropriate for the Court to use the full amount of the loss to the STAY DC program—*i.e.*, $38,560—when calculating the offense level for Count One

(Group One). That amount corresponds to the full amount of the funds that Simon fraudulently obtained from STAY DC. It is the actual loss incurred by the taxpayers. *See* U.S.S.G. § 2B1.1, Application Note 3(A) ("'Actual loss' means the reasonably foreseeable pecuniary harm that resulted from the offense."). The probation office also recommends that the Court calculate the loss for guideline purposes as $38,560. (PSR ¶ 42.)

The government submits that it is also appropriate for the Court to add a two-point increase to the offense level for Group One (Count One) because the offense conduct involved the use of an authentication feature. The defendant has admitted that he used the fake alias "Robert Sutton" and email account that the defendant controlled for "Sutton" in order scam the STAY DC program. (PSR ¶ 43.) The defendant also caused the misuse of a notary seal in connection with creating a false document signed by "Sutton" for his civil suit. (PSR ¶¶ 21-22; Exs. 2, 3.) The probation office has also concluded that this two-point increase should apply. (PSR ¶ 43.)

With the addition of the four-point adjustment for the amount of the loss and the two-point adjustment for the use of an authentication feature, the resulting guideline offense level for Count One (Group One) and Count Two (Group Two) is 17. (PSR ¶ 59.) The resulting total offense level after the three-point reduction for acceptance of responsibility is 14.[10]

The defendant has a criminal record that includes arrests and convictions stretching back decades. (PSR ¶ 67.) However, for purposes of calculating his criminal history score, Simon should receive one point for his assault guilty plea and one point for his felony gun conviction in 2016 (PSR ¶¶ 71-72.) Simon's criminal history score is two, which places him in Category II.

---

[10] The government notes that the probation office has also recommended that the Court apply an additional two-point increase because the offense involved benefits provided in connection with a presidentially declared major disaster or emergency—the COVID-19 pandemic. (PSR ¶ 44.) The parties have not agreed that increase should apply here.

(PSR ¶ 73.) The parties agree that with an offense score of 14 and a criminal history of Category II, the recommended guideline range is 18 to 24 months of incarceration. (PSR ¶ 99.)

## STATUTORY FACTORS

As the Court is also well aware, after calculating the applicable Guidelines range, a sentencing court must then consider that range as well as the sentencing factors set forth in 18 U.S.C. § 3553(a) and determine a sentence that is appropriate and reasonable for the individual defendant. *Nelson*, 555 U.S. at 351; *see also United States v. Hughes*, 401 F.3d 540, 546 (4th Cir. 2005). With respect to that section's enumerated factors, of particular relevance here are the "nature and circumstances of the offense," the need for the sentence "to reflect the seriousness of the offense" and provide "just punishment," "the history and characteristics of the defendant," the need "to promote respect for the law," the need to "avoid unwarranted sentence disparities," and the need for the sentence "to afford adequate deterrence to criminal conduct." 18 U.S.C. §§ 3553(a)(1), (a)(2)(A), (a)(2)(B), (a)(6), (a)(7).

### Nature and Circumstances of the Offense, and its Seriousness

The charges to which the defendant has pleaded guilty are serious by any measure. At a time when millions of Americans faced housing insecurity—and Congress responded by releasing Treasury-backed funds as a remedy—the defendant saw an opportunity to cheat the taxpayers out of $38,000 in assistance. The defendant had no acute financial need for such assistance because, as he told the probation office, he ran a company with annual profits of $500,000 and earned $140,000 annually. (PSR ¶ 124.) He was not a "tenant" who was eligible under the STAY DC program because he owned the property where he lived. (PSR ¶¶ 15, 97.) And "Robert Sutton" was not his landlord. (*Id.*) Nonetheless, the defendant completely fabricated an application for STAY DC benefits.

The criminal conduct is also outrageous considering that the STAY DC program exhausted its funds and had to stop accepting applications in November 2021.[11] As a result, Simon fraudulently collected a taxpayer subsidy to the detriment of other D.C. residents who did not receive STAY DC assistance. Even more troubling, rather than using the funds to cover housing costs, the defendant used the STAY DC funds for his own personal benefit. Simon used the funds to pay private school tuition and to pay court-ordered child support obligations. (PSR ¶ 25.)

The fraud scheme in Count One would warrant a substantial period of incarceration. But the defendant has also pleaded guilty in Count Two to an additional crime that independently would warrant a significant period of in incarceration. The defendant without question knew that as a prior felon he was prohibited from possessing a handgun. (PSR ¶ 30.) Indeed, one of his prior felony convictions was for possessing a pistol without a license. (*Id.*) The two firearms recovered during the search at Simon's home on March 14, 2024, were not even stored in a locked box or a secure container meaning that the two minor children had access to the weapons and ammunition. (*Id.* ¶¶ 30-31.)

History and Characteristics of the Defendant

The defendant has a long history of arrests and convictions that date back to the 1970s. That criminal history shows a pattern of fraud and deceit. As but a few examples, he has convictions for felony larceny after trust in Maryland (*Id.* ¶ 67); check fraud in Virginia (*Id.* ¶ 68); mail fraud, tax fraud, and interstate transportation of stolen property in the Eastern District of Virginia (*Id.* ¶ 69); and wire fraud and mail fraud in the Middle District of Pennsylvania. (*Id.*

---

[11] Joshua Montgomery-Pratt, Greater Greater Washington, *DC Leaders Lag in Finding Funds to keep STAY DC Afloat* (November 22, 2021) *available at* https://ggwash.org/view/83142/dc-leaders-lag-in-finding-funds-to-keep-stay-dc-afloat.

¶ 70.)  Simon has spent years in prison for his prior crimes, but continues to re-offend including the case now before the Court.

Simon's penchant for fraud and falsehoods was recognized by the trial judge who handled Simon's divorce and custody matter in family court.  The court commented directly on Simon's character for deceit in its Findings of Fact, Conclusions of Law and Judgment of Absolute Divorce.[12]  The Court noted,

> Mr. Simon presents himself as very charismatic and forthright, but when digging below the surface of his testimony, it becomes clear that he may not be as candid as he seems. Mr. Simon made many statements during both the pendente lite hearing and the trial that simply do not seem credible. For example, at the pendente lite hearing he stated that he had not paid his mortgage payment to USTrust/Nine Lenders Capital Associates ("Nine Lenders") in nine years, but that no foreclosure action had been brought against him. This statement is simply not credible—any lending company that has not received a payment in even one or two years is going to take action to recoup that investment.

In its discussion of child support obligations, the Court noted,

> The existence of Nine Lenders has been questioned throughout this entire litigation. Ms. Smith Simon has argued that there is no evidence that Nine Lenders exists or that it is a valid entity. Mr. Simon has not provided documentation to show otherwise. . . . [T]he Court has serious doubts as to the veracity of these foreclosure actions and Nine Lenders in general.

Finally, the Court found "that none of [SIMON's] testimony or evidence is credible in regard to his rental properties, his relationship with Nine Lenders, and the purported foreclosures that require all rental income from these properties to go straight to Nine Lenders."

The defendant's history and characteristics weigh in favor of a period of incarceration for his latest fraud conviction.  And his possession of a firearm while already being convicted of

---

[12] Although the docket for family matters are not typically available online, one of the parties in civil case 2018CA005831 attached a copy of this judgment to its filing.  The divorce matter is *Summer Smith Simon v. Geary Simon*, No. 2017DRB003716.

felony possession a firearm additionally indicates that the defendant does not understand that he cannot continue to possess such dangerous weapons.

Promotion of Respect for the Law
General Deterrence, and Avoiding Disparities

This case involves fraud on a government program that was motivated by greed at a time when millions of Americans were suffering from the economic impact of a global pandemic. As the pandemic spread, so too did fraud related to the programs designed to provide critical economic assistance. Actors like Simon who seek to defraud these programs not only drain the program of limited funding; they make it more difficult for administrators of government and other relief programs to get aid to individuals that qualify for and need it. The government's recommended sentence of incarceration in this case is thus appropriate to send a message to other offenders that there are serious consequences for defrauding government pandemic relief programs.

The government's recommended sentence of 18 months of incarceration, which is within the guideline range, will not create an unwarranted sentencing disparity. Courts have not hesitated to sentence defendants who have cheated pandemic relief programs to substantial terms of imprisonment that are consistent with the guideline range in those cases. *See, e.g., United States v. David Hines*, No. 21-CR-20011 (S.D. Fla. May 12, 2021) (78 months of incarceration; guideline range of 63-78 months); *United States v. Ganell Tubbs*, No. 20-CR-193 (E.D. Ark. March 15, 2021) (41 months of incarceration; guideline range of 41-51 months); *United States v. Benjamin Rafael*, No. 21-CR-20161 (S.D. Fla. July 14, 2021) (18 months of incarceration; guideline range of 12-18 months).

The Judiciary Sentencing Information collected by the probation office shows that there were 34 defendants sentenced between 2019 and 2023 whose primary guideline was § 2K1.1

(Felon-in-Possession) with a final offense level of 14 and Criminal History Category II, after excluding those defendants who received downward departures for substantial assistance to law enforcement.  (PSR ¶ 171.)  Of those 34 cases, 30 defendants received a sentence of imprisonment with the median sentence of imprisonment being 18 months.  (*Id.*)  Accordingly, the government's recommendation of 18 months of incarceration for Simon falls squarely with comparable cases.

## RESTITUTION AND FORFEITURE

The victim of the fraud in this case was the taxpayers.  As part of the sentence in this case, the Court should order the defendant to make restitution to the taxpayers for the full amount of their loss, *i.e.*, $38,560.

Forfeiture is separate from restitution.  The Court should enter a forfeiture money judgment against the defendant in the amount of the proceeds that the defendant actually obtained from his participation in the fraud scheme.  In this case, the defendant misappropriated $38,560 in taxpayer assistance for his own benefit and the Court should enter a forfeiture money judgment in that amount.  Because this case also involves firearms, the Court should issue an order of forfeiture as to all firearms and ammunition involved in or used in the commission of the offense in Count Two.  The forfeiture allegation in the Information provides notice to the defendant that the government intends to seek forfeiture of a money judgment, the firearms, and the ammunition at sentencing.  (ECF 1 at 5-6.)

The government will provide proposed orders of restitution and forfeiture to the Court in advance of sentencing.

**CONCLUSION**

The government recommends that the defendant be sentenced to serve a period of incarceration of 18 months which is consistent with the sentencing guidelines. The government also asks that the Court enter orders of restitution and forfeiture as described above.

Respectfully submitted,

EDWARD R. MARTIN, JR.
United States Attorney

By: _____
JOHN W. BORCHERT (Bar No. 472824)
Assistant United States Attorney
Fraud, Public Corruption & Civil Rights Section
601 D Street, NW
Washington, D.C. 20530
(202) 252-7679
john.borchert@usdoj.gov

April 29, 2025

CERTIFICATE OF SERVICE

I hereby certify that on this 29th day of April 2025, I caused a copy of the foregoing to be served on counsel for the defendant via the Court's ECF notification system.

_____
JOHN W. BORCHERT
Assistant United States Attorney